UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------- X

MARC OLIVER                                           :

                                                     :        **05 CV 4318 (VM)**

                    Plaintiff,                        :

                                                     :        **<u>AMENDED COMPLAINT</u>**

                                                     :

        -against-                                     :        **PLAINTIFF DEMANDS A**
                                                     :        **<u>TRIAL BY JURY</u>**
                                                     :

BANC OF AMERICA SECURITIES LLC,                      :

                                                     :

                    Defendant                         :

---------------------------------------------------------- :

                                                     X

Plaintiff, Marc Oliver ("Plaintiff" or "Mr. Oliver") by his attorneys, Levine &

Blit, PLLC, and for his Complaint against Defendant Banc of America Securities

LLC ("BAS" or "Defendant" or the "Company") alleges as follows:


<u>NATURE OF THE CASE</u>


1.      This action is brought against Defendant to redress the deprivation of rights

        secured to Plaintiff by the Title VII of the Civil Rights Act of 1964, as amended,

        42 U.S.C. § 2000e <u>et</u> <u>seq.</u>, 42 U.S.C. §§1981 <u>et</u> <u>seq.</u>, New York Human Rights

        Law, N.Y. Exec. Law § 290 <u>et</u> <u>seq.</u>, and New York City Human Rights Law,

        NYC Admin Code § 8-101 <u>et</u> <u>seq.</u>

**JURISDICTION AND VENUE**

2.  This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. §§ 1343 and 1331, because the claims arise under the laws of the United States and are brought to recover damages for deprivation of equal rights. This Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

3.  Declaratory and injunctive relief is sought under 28 U.S.C. § 2001 et seq.

4.  Venue is proper in this District under 28 U.S.C. § 1391(b) and (c), and 42 U.S.C. § 2000e-5(f)(3), because Defendant has offices, conducts business, and can be found in this District, and because the causes of action arose and the acts and omissions complained of occurred in this District.

**PARTIES**

5.  Plaintiff is, and at all relevant times has been, a citizen of the United States, and is presently relocating to California..

6.  Plaintiff is an African American male.

7.  Defendant, a subsidiary of Bank of America Corporation, is a full-service U.S. investment bank and brokerage firm with principal offices in San Francisco, New York, and Charlotte, NC.

8.  Defendant is a Delaware Limited Liability Company that maintains a principal

place of business at 9 West 57th Street, New York, New York 10019.

9.      Defendant is engaged in interstate commerce, regularly conducts business in New York and employs at least 15 employees in its New York, NY office.  Therefore, Defendant is an "employer" within the meaning of Title VII and all other statutes cited herein.

## CONDITIONS PRECEDENT

10.     Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") against Defendant, which satisfied the requirement of 42 U.S.C. § 2000e-5, on or about October 1, 2004. This filing was less than 300 days after one or more occurrences of Defendant's discriminatory conduct against Plaintiff.

11.     On or after February 12, 2005, Plaintiff received a Dismissal and Notice of Right to Sue letter from the EEOC.

12.     Plaintiff files this action within ninety (90) days of receipt of the letter.  Plaintiff has notified the New York City Commission on Human Rights by submitting to them a copy of this complaint.

## FACTUAL HISTORY

13.     Mr. Oliver began working with BAS on July 5, 2000, as a senior compliance officer for the Equity Trading Surveillance Compliance Department.

14.     Mr. Oliver worked in Defendant's San Francisco office.

15. Upon information and belief, in Defendant's New York Cash Equity Sales and Trading Division there are approximately 300 employees

16. Upon information and belief, of these 300 employees, approximately four were African-American, and all were in lower support level positions.

17. Upon information and belief there were not any African-Americans in any managerial positions in the compliance department at BAS.

18. Mr. Oliver's credentials include 14 different broker registrations and, as of 2003, 15 years of industry experience.

19. Upon information and belief, as a result, Mr. Oliver possessed credentials superior to those of any of his similarly titled colleagues.

20. In addition, upon information and belief, Mr. Oliver possessed more registrations than anyone he worked with in the compliance group, including managing directors, principals and presidents.

21. Shortly after Mr. Oliver began working for the Defendant, he noticed that his interactions with certain colleagues were problematic and that he was not being given the opportunities for advancement he expected.

22. In particular, the title of senior compliance analyst, which he was promised, did not become his working title.

23. Rather, Mr. Oliver was titled as a compliance analyst.

24. He was also not given the desk on the trading floor that he was promised upon hire.

25. Mr. Oliver had confidence in his abilities and potential for success.

26.     As a result, he tried to overlook these initial setbacks and worked diligently at his job.

27.     Mr. Oliver's overall reviews in the San Francisco office were satisfactory.

28.     Mr. Oliver did not, however, and did not find that his outstanding efforts were rewarded as he expected.

29.     On or about April of 2003, Mr. Oliver inadvertently came upon the pay stub of a white co-worker who worked in a position just like his and who had recently left the company.

30.     Mr. Oliver discovered that this co-worker, though she performed almost exactly the same work function he performed, was earning substantially more than he was.

31.     This discovery added to Mr. Oliver's suspicions that the workplace he was part of was unfair and discriminatory against African Americans.

32.     In April of 2003, Mr. Oliver was relocated to Defendant's New York City office.

33.     Mr. Oliver made this move at a significant personal expense as he was leaving behind his wife, a student at Stanford University in California.

34.     Mr. Oliver hoped that the move would give him new opportunities for advancement that were missing for his current work environment.

35.     He believed, perhaps, that he was finally getting a chance for the recognition he deserved.

36.     It quickly became clear to Mr. Oliver, however, that the discriminatory environment was not changing, and that he would continue to be treated unfairly because of his race.

37.    In particular, Mr. Oliver had a number of his meaningful responsibilities taken away from him when he reached New York.

38.    He was explicitly excluded, for example, from the planning and discussion of a trading and compliance meeting scheduled for April 29th, 2003 despite the fact that he was Assistant Vice-President in charge of Compliance.

39.    He was totally excluded from other such compliance meetings.

40.    When Mr. Oliver was included in a compliance meeting he was slighted.

41.    At one such meeting, for example, Marci Daffner (hereinafter "Ms. Daffner"), introduced every member of the compliance department, except Mr. Oliver, to the Listed Trading Desk personnel being trained.

42.    Mr. Oliver, ever the optimist, hoped to counter his loss of responsibility in one area with growth in another.

43.    He sent e-mails and made numerous attempts to involve himself in the group and to learn more, and specifically sought to learn, *inter alia*, more about broker-dealer services and money laundering issues.

44.    His attempts were not acknowledged in any meaningful way.

45.    Mr. Oliver noticed, however, that while he was denied opportunities to grow and learn, other white colleagues were given such opportunities and were trained often.

46.    Mr. Oliver also became aware that these, white employees were being paid far more than he was.

47.    This was consistent with his earlier observations of a discriminatory pay scale.

48.     It was also despite the fact that he had more experience and better credentials than his higher-paid white colleagues.

49.     Mr. Oliver contacted Anita Sabol and Todd Cunningham in corporate personnel with respect to his suspicions about a discriminatory work environment on May 30, 2003.

50.     No adequate response was provided.

51.     Nevertheless, Mr. Oliver did not want his move to New York to be in vain.

52.     As a result, Mr. Oliver sent a memorandum, dated June 9, 2003, to his immediate, Managing Director of Equity Trade Compliance, Ms. Daffner.

53.     In the memorandum, Mr. Oliver specifically pointed out ways in which he was being excluded from job opportunities and quality work.

54.     Mr. Oliver pointed out, for example, that Steve Hadermayer, a white male colleague, was being asked to send out compliance advisories that Mr. Oliver normally sent out.

55.     Mr. Oliver further pointed out to Ms. Daffner that he was being specifically excluded from Trading Technology Meetings, had not been given the trading floor desk he was promised, and was not being granted the same opportunities for advancement or basic consideration as other similarly situated white colleagues.

56.     This e-mail marked Mr. Oliver's most specific confrontation, up to that date, with his direct management regarding the fact that he was being excluded from opportunities for advancement.

57.     As a result of this e-mail, the retaliation against Mr. Oliver began.

58.    The retaliatory environment was evident during a June 20, 2003 meeting initiated by Mr. Oliver to discuss his concerns.

59.    The meeting included Ms. Daffner and Chief Compliance Officer Mr. Vincent Faughnan ("Mr. Faughnan").

60.    This meeting, which Mr. Oliver requested, was not in any way designed for him to express more fully the concerns he had about the deliberate, discriminatory attempts of management to hold him back and sabotage his prospects for career advancement.

61.    In fact, the meeting instead focused on Ms. Daffner's dissatisfaction with Mr. Oliver.

62.    At the meeting, Ms. Daffner and Mr. Faughnan admitted that they had not made attempts to train Mr. Oliver or to help with his career advancement.

63.    Ms. Daffner stated that she did not want to train Mr. Oliver because she did not want to allow him to pad his resume.

64.    Ms. Daffner was unwilling to acknowledge that cross-training was offered to other white workers.

65.    She also failed to acknowledge that cross training provided a valuable work function in that it allowed employees in the group to back one another up in the event of overflow or absences.

66.    The meeting, as a whole, also demonstrated that the Defendant had no interest in addressing the discrimination Mr. Oliver was facing.

67.    In fact, Ms. Daffner and Mr. Faughnan did not address Mr. Oliver concerns about discrimination at all.

68. Rather, they retaliated against him, manufacturing criticisms of his work to counter his attacks of unfair, discriminatory work practices.

69. Upon information and belief, during this meeting and following it, the Defendant did not take any steps to address or investigate the discrimination Mr. Oliver mentioned

70. Despite his supervisors' blatant disregard for his complaints, Mr. Oliver continued to make efforts to receive training on other types of surveillance reports in order to increase his value to the Company.

71. On or about June 24, 2003, he requested a transfer to another group within the Compliance Department.

72. Mr. Oliver was not granted this transfer or any other that he applied for, despite his qualifications.

73. His group did not want him to have opportunities under them or elsewhere at BAS.

74. On July 25, 2003, Ms. Daffner reprimanded Mr. Oliver for, *inter alia*, not informing her quickly enough that a colleague had lost his wallet and had to leave the office to search for it, and for not holding the elevator door for her.

75. Ms. Daffner, in addition, copied the Human Resources Department on this e-mail and asked that it be placed in his permanent file.

76. The pettiness of this criticism does not warrant comment.

77. Suffice it to say that Mr. Oliver was more than aware of the fact, by this time, that he was being targeted for termination because he was an African American male opposed to the discrimination in his workplace

78.　　To protect his interest, Mr. Oliver wrote a rebuttal to Ms. Daffner's criticisms of him, specifically suggesting that she learn more about the importance of diversity and inclusion in the workplace.

79.　　Mr. Oliver specifically referred Ms. Daffner to the BAS policies purported to embrace diversity.

80.　　Mr. Oliver also copied Jessica Johnson from the Human Resources Department (hereinafter "Ms. Johnson") and Mr. Faughnan.

81.　　No one in the Company to any steps to consider or investigate this alleged harassment of Mr. Oliver based upon his race.

82.　　In fact, not one employee or supervisor attempted to meet with Mr. Oliver to discuss his concerns.

83.　　He was left to assume that BAS was not concerned about the discriminatory environment he felt he was being subjected to.

84.　　While Mr. Oliver sought a transfer, and knew he did not have a bright future with BAS, he also continued to work the system from within in search of any chance to advance.

85.　　Predictably, he found no one willing or able to assist.

86.　　On August 19, 2003, he specifically asked Mr. King Yee (hereinafter "Mr. Yee") for an opportunity to be trained on the Free Riding and other syndicate reports so that he could back-up his colleagues.

87.　　There was no response to this request from Mr. Yee.

88.    Consistent with the discriminatory and retaliatory environment, however, just weeks later Mr. Yee was very proactive in assuring that white male Craig Palmer was trained on how to complete Mr. Oliver's compliance reports.

89.    In short, the Defendant was undermining Mr. Oliver's ability to grow and learn in the Company while, at that same, ensuring that other white males received all the training possible for their advancement.

90.    In fact, white men and women were being trained to replace Mr. Oliver.

91.    The harassment grew in intensity and began to extend beyond simply restricting Mr. Oliver's opportunities for workplace advancement.

92.    White employees were, for example, granted flexible work schedules and vacation allowances that Mr. Oliver was not able to take advantage of.

93.    Because Mr. Oliver's wife was in California, this was a significant personal attack on Mr. Oliver's family.

94.    On Tuesday, September 30, 2003, for example, Mr. Oliver requested that he be given leave to take three days off, and work out of the San Francisco Office for a week thereafter.

95.    Mr. Oliver's wanted an opportunity to visit his wife in California, and he had been promised the opportunity to do so often, when he accepted the transfer to New York.

96.    Nevertheless, Mr. Oliver's managers reacted in a remarkably harsh and discriminatory tone to Mr. Oliver's request.

97.   Mr. Daffner, for example, granted Mr. Oliver permission to work from such a location, but nastily pointed out the obvious, in stating that his office was in New York and not San Francisco.

98.   Mr. Faughnan, in an even more remarkable display of heavy handedness and retaliation, told Mr. Oliver that he should not assume that he could work out of other offices.

99.   Mr. Faughnan, in fact, insisted on a formal, documented meeting with Mr. Oliver to review his work and the way he comported himself with supervisors.

100.  Mr. Faughman also insisted that a copy of the vacation discussion, and a reprimand of Mr. Oliver, be placed in Mr. Oliver's file.

101.  In short, Mr. Oliver was reprimanded and disciplined for requesting vacation time and seeking to visit his wife.

102.  Upon information and belief other white employees in positions similar to Mr. Oliver were often allowed to work from San Francisco, and were not harassed in this manner.

103.  A similar event transpired on October 27, 2003.

104.  On that date, Mr. Oliver informed Mr. Yee and Ms. Daffner that he would be in the San Francisco office on September 28, from 5:30 am to 9am and would be flying to New York on a flight leaving at 11am.

105.  Mr. Oliver informed Mr. Yee of this arrangement by e-mail and in person.

106.  Ms. Daffner responded that Mr. Oliver should take the entire day of the 28th as a vacation day, though he was working during part of it.

107.    When Mr. Oliver objected, Ms. Daffner requested a meeting with him and the Human Resources Department to discuss his insubordination.

108.    Upon information and belief Defendant's white workers were allowed to work from other offices and were not disciplined in any way when they made requests similar to Mr. Oliver's request.

109.    A meeting to discuss the vacation issue was held on November of 2003, and turned into yet another attempt to criticize Mr. Oliver's behaviors, while avoiding his concerns of race and sex discrimination.

110.    Interestingly enough, personnel department representative Gina DeJoseph ("Ms. DeJoseph") remarked on several occasion, during this meeting and others, that Mr. Oliver's performance was not an issue.

111.    Ms. DeJoseph remarked, in fact, that Mr. Oliver's attitude was the problem.

112.    By this point, one might wonder how Mr. Oliver could maintain a positive attitude.

113.    Mr. Oliver responded to all of the criticisms set forth in the meeting in a written statement he submitted to Ms. DeJoseph on November 18, 2003.

114.    He received no response to this rebuttal from Ms. DeJoseph.

115.    Mr. Oliver also filed a charge of discrimination against BAS with the EEOC at this time.

116.    In January of 2004, Mr. Oliver met with Ms. DeJoseph and was told the he could start looking for new opportunities at the Company.

117.   Mr. Oliver was not offered any help in seeking or finding such positions and the retaliatory environment worsened as a result of the fact that he filed the EEOC charge.

118.   Mr. Oliver made sincere efforts to find a new position, in no small part because if he left the company less than twelve months after relocating, he would be liable, personally, for all relocating costs.

119.   Mr. Oliver continued to work and look for a new position through the earlier part of January 2004.

120.   On Monday morning, March 29, 2004, he returned from a ten day vacation with his wife in California.

121.   Mr. Oliver was called into a conference room and told that he was being fired for insubordination.

122.   The alleged insubordination apparently related to a routine interaction he had with Mr. Yee regarding compliance issues.

123.   Mr. Oliver was stunned that such a situation could lead to his termination.

124.   Mr. Oliver, during his tenure with the Company obtained two securities registrations.   He became the Equity Trading Department's only NASD Arbitration Panelist, and joined and participated in several regulatory groups to improve his knowledge of his field and his ability to perform his job well.

125.   Mr. Oliver sought every opportunity for advancement, and despite the discriminatory environment he was subjected to, sought to work within BAS.

126.   When he did complain about the discrimination, he was retaliated against and fired.

127. Upon information and belief Mr. Oliver, since his departure from BAS has applied for jobs and been rejected based upon information provided by former BAS supervisors.

128. These actions further establish the steps BAS is wiling to take to continue retaliating against Mr. Oliver.

129. The above conduct is not exhaustive, but only illustrative of the discriminatory and retaliatory conduct of Defendant BAS towards Mr. Oliver.

## COUNT I

### (Race Discrimination In Violation of Title VII)

130. Plaintiff realleges each and every allegation in paragraphs 1 through 126 as if set forth in full herein.

131. Defendant intentionally discriminated against Plaintiff based upon his race in violation of Title VII of the Civil Rights Act of 1964 by denying him equal terms and conditions of employment and ultimately terminating his employment.

132. As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered monetary damages, including, but not limited to, a loss of income, including past salary, future salary, and company-sponsored benefits.

133. As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

## COUNT II

**(Retaliation In Violation of Title VII)**

134.   Plaintiff realleges each and every allegation in paragraphs 1 through 130 as though set forth in full herein

135.   In dismissing his complaints of race discrimination and ultimately terminating his employment, Defendant willfully and unlawfully retaliated against Plaintiff because of his opposition to the employment discrimination he was being subjected to.

136.   Defendant's retaliatory conduct violated Title VII, 42 U.S.C.A. § 2000e-3.

137.   As a direct and proximate consequence of Defendant's intentional, unlawful and discriminatory employment policies and practices, Plaintiff has suffered monetary damages, including, but not limited to, a loss of income, including past salary, future salary, and company-sponsored benefits.

138.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

## COUNT III

**(Race Discrimination in Violation of 42 U.S.C. 1981)**

136.   Mr. Oliver repeats and realleges the allegations contained in paragraphs 1 through 135 as if separately set forth herein.

137.   Mr. Oliver is an African American presently and at all times relevant to this complaint, residing within the jurisdiction of the United States of America.

138.   Mr. Oliver was regularly and egregiously harassed and insulted based upon his race

by his employer, BAS.  Such harassment was unwelcome.

139.    Mr. Oliver was subjected to these harassing terms and terminated based upon his race in violation of 42 U.S.C. 1981.

140.    Mr. Oliver reasonably took advantage of preventive and corrective opportunities provided by Defendants by reporting that harassment to the requisite parties named above on a number of occasions.

141.    As a result of Defendant's unlawful discrimination, Mr. Oliver has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

142.    Since Defendants engaged in and condoned discriminatory practices with malice or with reckless indifference for Mr. Oliver's federally protected statutory rights, Mr. Oliver also requests an award of punitive damages, in an amount to be determined at trial.

## COUNT V

### (Race Discrimination In Violation Of New York Human Rights Law)

149.    Plaintiff realleges each and every allegation in paragraphs 1-142 as though set forth in full herein.

150.    Defendant intentionally discriminated against Plaintiff based upon his race in violation of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, by denying him equal terms and conditions of employment and ultimately terminating his employment.

151.    As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and

continues to suffer, monetary damages, including, but not limited to a loss of income, including past salary, future salary, and company-sponsored benefits.

152.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

## COUNT VI

### (Retaliation In Violation of New York Human Rights Law)

153.   Plaintiff realleges each and every allegation in paragraphs 1-152 as though set forth in full herein.

154.   In dismissing Plaintiff's complaints and terminating him, Defendant willfully and unlawfully retaliated against Plaintiff because he sought to exercise rights under the New York Human Rights Law.

155.   Defendant's retaliatory conduct violated the New York Human Rights Law, N.Y. N.Y. Exec. Law § 290 *et seq.*

156.   As a direct and proximate consequence of Defendant's intentional, unlawful and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, monetary damages, including, but not limited to, a loss of income, future salary, and company-sponsored benefits.

157.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

## COUNT VII

### (Race Discrimination In Violation Of New York City Human Rights Law)

158.   Plaintiff realleges each and every allegation in paragraphs 1-157 as though set forth in full herein.

159.   Defendant intentionally discriminated against Plaintiff based upon race in violation of the New York City Human Rights Law, NYC Admin Code § 8-101 *et seq.* by denying him equal terms and conditions of employment and ultimately terminating his employment.

160.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, monetary damages, including, but not limited to a loss of income, including past salary, future salary, and company-sponsored benefits.

161.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

## COUNT VIII

### (Retaliation In Violation of New York City Human Rights Law)

162.   Plaintiff realleges each and every allegation in paragraphs 1-161 as though set forth in full herein.

163.   In dismissing Plaintiff's complaints and terminating him, Defendant willfully and unlawfully retaliated against Plaintiff because he sought to exercise rights under the New York City Human Rights Law.

164.   Defendant's retaliatory conduct violated the New York City Human Rights Law, NYC Admin Code § 8-101 *et seq.*

165.   As a direct and proximate consequence of Defendant's intentional, unlawful and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, monetary damages, including, but not limited to, a loss of income, future salary, and company-sponsored benefits.

166.   As a direct and proximate consequence of Defendant's intentional, unlawful, and discriminatory employment policies and practices, Plaintiff has suffered, and continues to suffer, non-monetary damages, including, but not limited to, mental and physical pain and suffering.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.   declaring that Defendant's actions and practices violated Title VII, 42 U.S.C. 1981, the New York Human Rights Law, and the New York City Human Rights Law;

B.   permanently enjoining Defendant from engaging in actions or practices that discriminate against any employees or job applicants because of their race or sex;

C.   directing Defendant to make Plaintiff whole by providing him back pay, front pay, reimbursement for any and all lost benefits, and reimbursement for any and all medical expenses for injuries caused or exacerbated by Defendant;

D.   directing Defendant to pay Plaintiff compensatory damages for his emotional

distress caused by Defendant's discrimination and harassment against him;

E.      directing Defendant to pay Plaintiff punitive damages sufficient to punish

and deter continuation of Defendant's unlawful employment practices;

F.      granting additional relief as this Court deems just and proper.

Dated:      New York, New York
            August 5, 2005

                                    LEVINE & BLIT, PLLC


                                    By:_____
                                    Matthew J. Blit (4145)
                                    Patrick J. Boyd (0921)
                                    Attorneys for Plaintiff
                                    Marc Oliver
                                    Empire State Building
                                    350 5th Avenue, Suite 6902
                                    New York, New York 10118
                                    (212) 967-3000


cc:     Banc of American Securities LLC
        9 West 57th Street
        New York, New York  10019
        c/o Joseph Baumgarten
        Proskauer Rose LLP